# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| LISA O. and HAYLEY H., | Case No.: 1:12-CV-285-EJL-REB |
| Plaintiffs, | **REPORT AND RECOMMENDATION RE:** |
| vs. | |
| | **DEFENDANT BLUE CROSS OF IDAHO HEALTH SERVICE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>**(Docket No. 99)** |
| BLUE CROSS OF IDAHO HEALTH SERVICES and HEALTHWISE, INC. | |
| Defendants. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br>**(Docket No. 103)** |
| | **DEFENDANT HEALTHWISE, INC.'S MOTION FOR SUMMARY JUDGMENT**<br>**(Docket No. 108)** |

Now pending before the Court are: (1) Defendant Blue Cross of Idaho Health Service, Inc.'s ("Blue Cross") Motion for Partial Summary Judgment (Docket No. 99); (2) Plaintiffs' Motion for Summary Judgment (Docket No. 103); and (3) Defendant Healthwise, Inc.'s ("Healthwise") Motion for Summary Judgment (Docket No. 108).[1] Having carefully considered the record, heard oral argument of counsel, and otherwise being fully advised, the undersigned enters the following Report and Recommendation:

---

[1] Plaintiffs' Motion for Award of Attorney Fees Pursuant to the September 2011 Separation Agreement (Docket No. 104) is also pending. However, during the December 2, 2014 hearing, the undersigned deferred consideration of this Motion. Therefore, the Motion is denied as moot, without prejudice to Plaintiffs to renew/reinstate the Motion at a later date, if necessary.

**REPORT AND RECOMMENDATION - 1**

# I.  GENERAL BACKGROUND

Plaintiff Lisa O. was employed by Healthwise from May 22, 2000 to September 30, 2011.  During this time, she and her minor daughter, H.H., were covered by the self-insured health benefits plan provided to Healthwise employees and their dependents (the "Plan").  The Plan was administered by Blue Cross.

Plaintiffs seek payment under the Plan for reimbursement of expenses incurred over a period of 15 months for H.H.'s attendance at two boarding schools – New Haven Residential Treatment Program and Boarding School ("New Haven") and the Aspen Institute for Behavioral Assessment ("Aspen") – providing educational and behavioral modification therapy.  Lisa O.'s request for preauthorization of admission into New Haven was denied on September 30, 2010.  Likewise, the Plan denied coverage at Aspen on October 12, 2010.  Lisa O. unsuccessfully appealed those denials.

Plaintiffs assert ERISA claims against Blue Cross and Healthwise.  *See* Third Am. Compl., ¶¶ 46-48 (Docket No. 91) ("Blue Cross and the Plan breached their fiduciary duties to Lisa and [H.H.] when they failed to comply with its obligations under 29 U.S.C. § 1104 and 29 U.S.C. § 1133 to act for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of [H.H.'s] claims.  The actions of Blue Cross and the Plan in failing to provide coverage for [H.H.'s] medically necessary treatment at Aspen and New Haven are a violation of the terms of the Plan and Blue Cross's medical necessity criteria.  The actions of Blue Cross and the Plan . . . have caused damage to Lisa and [H.H.] in the form of denial of payment for medical services rendered to [H.H.] totaling approximately $160,215.00.").

**REPORT AND RECOMMENDATION - 2**

Blue Cross and Healthwise deny these claims, with Healthwise counterclaiming against Plaintiffs for declaratory judgment and tortious interference with contract. *See* Ans. (Docket Nos. 92 & 93). Each party now moves for summary judgment, as described here:

- Blue Cross contends that Plaintiffs' claims against it were waived or released by virtue of a December 19, 2011 "General Release of Claims" (the "Release"). *See generally* Blue Cross's MSJ (Docket No. 99).

- Healthwise joins in Blue Cross's arguments, and alternatively argues (joined by Blue Cross) that Plaintiffs' claims should be dismissed because the types of treatment H.H. received at New Haven and Aspen were specifically excluded from the Plan. Specifically, Healthwise contends that the Plan did not cover expenses "[f]or Inpatient or Outpatient Custodial Care; or for Inpatient or Outpatient services consisting mainly of educational therapy, behavioral modification, self-care or self-help training, except as specified as a Covered Service under this Plan." *See generally* Healthwise's Joinder (Docket No. 102); Healthwise's MSJ (Docket No. 108); Blue Cross's Joinder (Docket No. 109).

- Finally, Plaintiffs submit that "[t]he unambiguous language of the Plan requires coverage of [H.H.'s] treatment at Aspen and New Haven. *See generally* Pls.' MSJ (Docket No. 104).

## II.  <u>REPORT</u>

**A.    Cross-Motions for Summary Judgment: The Standard**

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence in a light most favorable to the non-moving party,

the movant is clearly entitled to prevail as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that there is no material factual dispute, and the court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. *See Celotex*, 477 U.S. at 324. Material facts which would preclude summary judgment are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The relevant substantive law will determine which facts are material for purposes of summary judgment. *See id*.

Where, as here, both parties move for summary judgment, the summary judgment standard does not change, and the court must evaluate each party's motion on the merits. *See, e.g.*, *Farm Bureau Ins. Co. of Idaho v. Kinsey*, 234 P.3d 739, 742 (Idaho 2010) (citation omitted); *see also Nolan v. Heald College*, 551 F.3d 1148, 1154 (9th Cir. 2009) (applying traditional summary judgment standards to cross-motions for summary judgment in ERISA benefits denial case). Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing there is no genuine issue of material fact by demonstrating an "absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party establishes an absence of evidence to support the non-moving party's case, the burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." *Bhan v. NME Hosp. Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial. *See Celotex*, 477 U.S. at 323.

Where the moving party instead bears the burden of proof on an issue at trial, "it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a

prima facie showing in support of its position on that issue.  That is, the moving party presents

evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  Once done, the

non-moving party must set forth specific facts controverting the moving party's prima facie

case."  *Sabatino v. Liberty Life Assur. Co. of Boston*, 286 F. Supp. 2d 1222, 1229 (N.D. Cal.

2003) (citing *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994)).

**B.     Blue Cross's Motion for Partial Summary Judgment**

On September 30, 2011, Healthwise provided Lisa O. with a "Separation Agreement,"

attaching thereto the Release.  In consideration for her decision to enter into the Separation

Agreement and to sign the Release, Lisa O. would remain on Healthwise's payroll by utilizing a

combination of all accrued sick and vacation hours, holiday pay, and regular hours, through

December 31, 2011– her last day of employment with Healthwise.  Lisa O. signed the Separation

Agreement on September 30, 2011.  On December 19, 2011, Lisa O. signed the Release, which

provides in relevant part:

> In consideration of the payments, benefits and promises stated in the Separation
> Agreement dated September 30, 2011 between myself and Healthwise, Incorporated
> and to the fullest extent permitted under applicable law, *I, Lisa O. [REDACTED],
> hereby forever release, discharge and promise not to sue Healthwise and its officers,
> members, directors, employees, agents, representatives, insurers and assigns
> (collectively "Releasees"), and all predecessors and successors of Healthwise and
> the Releasees, whether known or unknown to me as of December 30, 2011 [or
> December 31, 2011 if signed after December 30, 2011], with respect to any and all
> claims, liabilities, obligations, debts, damages, demands, losses, judgments, costs
> and expenses of any kind arising out of or in connection with my employment,
> compensation, or my separation from employment with Healthwise ("Claims") that
> existed or may have existed as of December 30, 2011 [or December 31, 2011 if
> signed after December 30, 2011].  This General Release waives any Claims, known
> or unknown by me, that I have or might have as of December 30, 2011 [or December
> 31, 2011 if signed after December 30, 2011] including without limitation any Claim
> under* Title VII of the Civil Rights Act of 1964, the Age Discrimination in
> Employment Act of 1967 as amended, the Older Worker's Benefit Protection Act,
> the American with Disabilities Act, the Family and Medical Leave Act, *the*

*Employee Retirement Income Security Act of 1974*, and/or any Claims under other applicable state, federal or local laws, regulations or ordinances or statutes or non-statutory rights of recovery dealing with employment, separation or termination, contract, disability, age, race, national origin, religion, gender, familial status, family and medical leave, wage, tort, or civil right matters, wage payment laws and any regulations under such laws, and/or any other Claims arising from acts or omissions before the execution of this General Release of Claims. *This General Release of Claims, however, does not affect any vested rights I might have for benefits under any group medical insurance, disability, workers' compensation, unemployment compensation, or retirement program.*

General Release of Claims, Attached as Ex. A to McDaniel Decl. (Docket No. 39, Att. 3)

(emphasis added).

When Lisa O. signed the Release, her claims (the same claims she raises in this lawsuit) had already been denied, appealed, and, again, denied on appeal.[2] Blue Cross contends that Lisa O. forever released these claims once she signed the Release. *See, e.g.*, Blue Cross's MSJ, pp. 7-8 (Docket No. 99, Att. 1) ("The claim at issue is not a claim for future medical benefits but rather litigation of a previously denied and disputed claim for past benefits. That claim was released."); *see also* Reply in Supp. of Blue Cross's MSJ, pp. 2 & 4 (Docket No. 128) ("[The Release] simply releases certain claims Lisa O. may have, which claims specifically include all ERISA claims. Since this lawsuit is an ERISA claim, Lisa O. has released that claim based upon the contractually agreed language quoted above. . . . . The fact that a claim had been filed,

---

[2] Blue Cross also notes that the June 30, 2011 letter advising Lisa O. that the final appeal would be denied also specifically advised her of the right to file a lawsuit for benefits claimed due, but that she never filed such a lawsuit. *See* Blue Cross's MSJ, p. 3 (Docket No. 99, Att. 1). Plaintiffs dispute this. *See* Pls.' Opp. to Blue Cross's MSJ, pp. 2-3 (Docket No. 120) ("Lisa does not dispute any of the factual statements provided by BCI in its Motion for Partial Summary Judgment with the exception that she denies she did not file suit for the benefits owed under the terms of the Plan. She did file suit for the benefits owed, although Lisa acknowledges that this lawsuit was filed after the sate she signed the Separation Agreement.")

**REPORT AND RECOMMENDATION - 6**

appealed twice, and that Lisa O. was advised of her right to file a lawsuit under ERISA make it clear that Lisa O. knowingly released her ERISA claims."). In response, Plaintiffs point to the section of the Release that carves out from any such release those "vested rights [she] might have for benefits" – arguing that Lisa O.'s right to reimbursement for expenses arising out of H.H.'s medical treatment was one such "vested right" at the time the Separation Agreement became effective on December 30, 2011. *See* Pls.' Opp. to Blue Cross's MSJ, pp. 2-8 (Docket No. 12).

Both Blue Cross and Plaintiffs agree that the Release is a contract, to be construed under customary principles of contract interpretation. *Compare* Blue Cross's MSJ, p. 4 (Docket No. 99, Att. 1), *with* Pls.' Opp. to Blue Cross's MSJ, p. 3 (Docket No. 120). That task begins with the Court examining the plain language of the Release to determine whether or not there is an ambiguity. *See Cascade Auto Glass, Inc. v. Idaho Farm Bureau*, 115 P.3d 751, 753-54 (Idaho 2005) (citing *Clark v. Prudential Property and Cas. Ins. Co.*, 66 P.3d 242, 245 (Idaho 2003)). This question of law must be resolved by construing the contract "as a whole, not by an isolated phrase." *Selkirk Seed Co. v. State Ins. Fund*, 18 P.3d 956, 959 (Idaho 2000). If the contract language is clear and unambiguous, the meaning and legal effect of the contract's terms are determined as a matter of law by the plain meaning of the words used. *See Pinehaven Planning Bd. v. Brooks*, 70 P.3d 664, 667 (Idaho 2003). However, if a contract is ambiguous, its interpretation is a question of fact which focuses on the intent of the parties. *See Page v. Pasquali*, 244 P.3d 1236, 1238 (Idaho 2010). A contract is ambiguous if it is reasonably subject to conflicting interpretations or is nonsensical. *See Swanson v. Beco Const. Co.*, 175 P.3d 748, 751 (Idaho 2007) (citations omitted).

Applying these standards, the undersigned finds that the Release is ambiguous and that interpretation of the Release involves issues of fact that preclude partial summary judgment in

Blue Cross's favor. In reaching that conclusion, the Court acknowledges that the Release

explicitly releases "any and all claims, liability, obligations, debts, damages, demands, losses,

judgments, costs and expenses of any kind arising out of [Lisa O.'s] employment with

Healthwise that existed or may have existed as of December 30, 2011 . . . *including* . . . any

Claim under . . . [ERISA]." *Supra*. Because Lisa O. previously sought reimbursement for the

same expenses she now contends are subject to her admitted ERISA claim in this action, Blue

Cross understandably contends that Plaintiffs' claims against Blue Cross in this case are

precluded by the Release. The complete language of the Release does not present nearly so tight

a string as Blue Cross contends, however. Indeed, the Release unequivocally excepts from its

operative release terms those "vested rights [Lisa O.] might have for benefits under any group

medical insurance . . . ." *Id*. What then, does that exception mean in the context of Lisa O.'s

contemporaneous release of "any and all claims," including ERISA claims? Such is the thorny

predicament presented by this case and the parties' briefing. Still, so long as "vested rights . . .

for benefits" could be understood to possibly mean Lisa O.'s right to payment for H.H.'s medical

expenses at New Haven and Aspen, an ambiguity exists in how the Release applies, if at all, to

Plaintiffs' claims against Blue Cross and Healthwise.

Of importance, neither the Plan, the Separation Agreement, nor the Release defines

"vested right" or, even, what "vested" means.[3] Referencing various decisions from across the

---

[3] Plaintiffs contend that the 2010 and 2011 Enrollee Certificates contain language
prohibiting the termination or modification of Lisa O.'s rights as to "Covered Services" rendered
prior to her termination with Healthwise, thus informing the question of whether certain health
benefits were vested as of the effective date of the Separation Agreement. *See* Pls.' Opp. to Blue
Cross's MSJ, pp. 3-7 (Docket No. 120) ("While the word 'vest' does not appear in this language
of the Certificates, the intent of Healthwise, the Plan sponsor, is clear: once medical services
have been provided to an employee, no subsequent termination or modification of the terms of
the Plan with regard to a particular employee may occur."). But, setting aside whether such
rendered services represent "Covered Services" (*see supra*), this argument ignores the fact that,

country, Blue Cross argues that benefits are only "vested" when they are "non-forfeitable" or guaranteed to exist even after an employee's termination. *See* Blue Cross's Mem. in Supp. of MSJ, p. 5 (Docket No. 99, Att. 1) ("In the ERISA employee benefit plan setting, whether healthcare benefit plans or pension plans, 'vesting' is a specific event that makes the benefits non-forfeitable."). Said another way, according to Blue Cross, because disputed claims to benefits may result in the denial of those claimed benefits, they are not vested benefits capable of surviving beyond an employee's termination – in other words, there is nothing to vest if the claim is denied.

There is some sense to this argument; however, the Release does not clearly address the preservation of vested benefits notwithstanding certain other released claims. *Compare with Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 581 (1st Cir. 1993) (involving release which retained "rights to vested benefits which have been accrued, funded, and vested to date . . . .").[4] If it did have more clarity on that point, Plaintiffs' attempt at explaining away the

---

in exchange for consideration, a party may contract away rights that might otherwise exist – just what the Release (or any release) does here. Plaintiffs' argument in this respect therefore misses the point. The question that remains, then, is whether, through the Release, Lisa O. contracted away her claim to any benefits represented by H.H.'s treatment at New Haven and Aspen.

[4] In *Rodriguez-Abreu*, cited favorably by Blue Cross, the plaintiff was aware of his potential eligibility for long-term disability benefits due to a heart ailment, but knew he would lose his right to them if he elected to accept the severance package because he was told the two were "mutually exclusive." *See Rodriguez-Abreu*, 986 F.2d at 588. This was so because, in part, the severance package (and associated release) included an acknowledgment that the plaintiff "underst[ood] that, if this application is accepted, [he] will receive the following benefits in lieu of any benefits [he] might otherwise receive under Chase's [long-term disability plan]." *Id*. at 587. From this, the court was able to "divine" the parties' intent, and concluded that the plaintiff made a voluntary and informed choice to participate in the severance package, with the plaintiff knowingly waiving his right to long-term disability benefits. *See id*. at 588. Although comparable, *Rodriguez-Abreu's* fact pattern is more detailed as to relevant facts than the record before the Court here. There, the court determined that the protected "vested benefits"

Release's legal impact on her case would be more problematic. Instead, the Release contains language that speaks of maintaining "vested rights" Lisa O. might have for benefits. It can be argued that Lisa O.'s right to seek reimbursement of medical expenses "vested" at the time the expenses were incurred – *before* the Release was executed – thus fitting within the Release's excluding proviso. In contrast, it could be argued that no benefit had vested at that same time. At oral argument, Blue Cross's counsel acknowledged as much when, in response to the Court's question concerning *Member Services Life Ins. Co. v. American National Bank and Trust Co. of Sapulpa*, 130 F.3d 950 (10th Cir. 1997) and that case's take on when a benefit might vest, he stated:

> What they're saying is, at the time the services, the medical services, are provided, your right to reimbursement under the terms of the plan would vest, but that doesn't mean it is a "vested benefit." A vested benefit is a benefit that [has] ongoing rights after the termination of employment [sic]. I mean, I think it's semantics. . . . . What happens in this situation is, the right to have a claim under the plan exists at the time that they received the treatment, but if the treatment is not covered, there's nothing, then it is a disputed claim. And at that point, you have no benefit. You have a disputed claim. We say it's not covered. . . . . There was no vesting in this case because the claim was denied. And we said you don't have that benefit. You don't have it. There's nothing to vest. What you have at that point is a dispute under the terms of the plan which was a claim that was released.

Blue Cross's counsel is correct in that it *is* semantics at play here. But in a world where courts are asked to rule a certain way as a matter of law (as is the case here by virtue of Blue Cross's Motion for Partial Summary Judgment), "semantics" is just another name for ambiguity, and the resulting genuine and disputed issues of material fact that reside beneath such ambiguity.

---

referenced within the release could not include the plaintiff's claim for long-term disability benefits (even if they had vested, which they did not because the plaintiff neither applied for nor received such benefits), given the plaintiff's clear understanding that he could not recover those benefits if he pursued Chase's severance package. That is, the plaintiff knew he could not "have his cake and eat it too." Such similar evidence of the parties' understanding and intent does not exist here. Therefore, *Rodriguez-Abreu's* non-controlling holding does not persuade this Court toward a holding on this issue in Blue Cross's favor as a matter of law.

The salient point here is that the Release is on its face not all-encompassing – Plaintiffs' claims are released, unless they are "vested rights." The ambiguity exists not in whether Lisa O. released all claims she might possibly have had at the time she signed the Release – she did not. Rather, the ambiguity exists as to what is contained in the box of "vested claims" that she did not release, if any. The term "vested rights" in the Release must mean something, and the Release could have easily "settled the pond" on these questions by expressly referencing details of Lisa O.'s previous coverage claims as either expressly released or expressly preserved. For whatever reason (which simply could have been a difficulty in identifying and agreeing upon the final form of such language as the terms of the Release were being negotiated), it did not. What is left, then, is an ambiguity incapable of resolution as a matter of law at this juncture. It is therefore recommended that Blue Cross's Motion for Partial Summary Judgment be denied.[5]

## C.     Plaintiffs' and Healthwise's Cross-Motions for Summary Judgment

Under ERISA, employee welfare benefit plans like the Plan here must include procedures for operation and administration of the plan, must name fiduciaries to control and manage the plan, and must provide a basis for payments to and from the plan. *See* 29 U.S.C. § 1102. The fiduciary of an ERISA welfare benefit plan – here, Blue Cross – shall exercise the "prudent man" standard of care, to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . and . . . defraying reasonable expenses of administering the plan . . . ." 29 U.S.C. § 1104(a)(1)(A)(i & ii) & (B).

---

[5]  The same reasoning augers for denial of Plaintiffs' Motion for Summary Judgment as well. In other words, a question of fact as to whether Plaintiffs' released their claims precludes those claims regardless of whether coverage under the Plan exists – the overall thrust of Plaintiffs' Motion for Summary Judgment. However, because the arguments raised therein are similar to those raised within Healthwise's Motion for Summary Judgment, the Court also addresses those issues within this Report and Recommendation. *See infra*.

In turn, a fiduciary shall discharge its duties "in accordance with the documents governing the plan insofar as such documents and instruments are consistent" with ERISA.  29 U.S.C. § 1104(a)(1)(D).  A fiduciary breaches its duty to a plan participant by preventing or interfering with the receipt of benefits to which the participant is entitled.  *See Blau v. Del Monte Corp.*, 748 F.2d 1348, 1353 (9th Cir. 1984) ("The administrator of an employee welfare benefit plan . . . has no discretion . . . to flout the reporting, disclosure and fiduciary obligations imposed by ERISA, or to deny benefits in contravention of the plan's plain terms.").

Whether Blue Cross properly denied coverage for the expenses associated with H.H.'s attendance at New Haven and Aspen under the Plan is the subject of Plaintiffs' and Healthwise' respective Motions for Summary Judgment.  Plaintiffs argue that the Plan covers such expenses and that Blue Cross's denial is contrary to the Plan's terms.  Healthwise disagrees, taking the position that the expense of H.H.'s treatment at New Haven and Aspen was specifically excluded from the Plan and that Blue Cross's denial of coverage was indeed appropriate.

1.   Standard of Review Under ERISA

The standard of judicial review of a denial of ERISA benefits depends upon the terms of the benefit plan.  Unless contrary language in contained in the plan, a denial is reviewed under a de novo standard.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  However, if "the benefit plan expressly gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms," then a less exacting standard of review – that of an abuse of discretion – is applied.  *Id*. at 102.  Under this standard, the administrator's decision will be upheld if it is reasonable and supported by substantial evidence in the administrative record as a whole.  *See McKenzie v. General Tel. Co. of Cal.*, 41 F.3d 1310, 1316-17 (9th Cir. 1994).

Here, there is no dispute that Blue Cross has the discretion to interpret the Plan's terms and determine eligibility for benefits. The Plan states such in direct terms:

> BCI is vested with authority and discretion to determine eligibility for coverage and whether a claim for benefits is covered under the terms of this Plan, based on all the terms and provisions set forth in this Plan, and also to determine the amount of benefits owed on claims which are covered.

Plan, p. 69, § XXII at BCI 1134 (Docket No. 108, Att. 3);[6] *see also Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.*, 293 F.3d 1139, 1142 (9th Cir. 2002) (holding that plan conferred discretion because its terms granted administrator "power" and "duty" to "interpret the plan and to resolve ambiguities, inconsistencies and omissions" and to "decide on questions concerning the plan and the eligibility of any Employee"). However, Plaintiffs argue that, even though Blue Cross might have the discretion to administer the Plan, that fact "does not automatically dictate an undiluted abuse of discretion standard of review." Pls.' Mem. in Supp. of MSJ, p. 2 (Docket No. 106). Instead, Plaintiffs submit that Blue Cross provided inconsistent reasons for denying Lisa O.'s claims to reimbursement benefits at every turn, then made an incorrect application of the Plan's terms when rendering those denials, and therefore under applicable law the standard of review should be de novo, or, at the very least, a significantly reduced abuse of discretion. *See id.* at pp. 2-7.

As a threshold matter, the Court rules here that the Plaintiffs' position on the standard review goes too far. Only in those "rare" cases "when a plan administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA" and acted "in utter disregard of

---

[6] The parties submitted, under seal, a stipulated set of administrative record documents for consideration of the merits of Plaintiffs' claims. Those documents are numbered "BCI 000001" through "BCI 001299." The 2010 Plan (BCI 001065-1140) does not materially differ in any relevant respects with the 2011 Plan (BCI 00141-1219). Additionally, references to BCI within documents in the administrative record are understood to mean Blue Cross.

the underlying purpose of the plan," will courts review de novo the administrator's decision to deny benefits. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971-72 (9th Cir. 2006); *see also Gatti v. Reliance Standard Life Ins. Co.*, 415 F.3d 978, 985 (9th Cir. 2005) ("[P]rocedural violations of ERISA do not alter the standard of review unless those violations are so flagrant as to alter the substantive relationship between the employer and employee, thereby causing the beneficiary substantive harm.").

Further, and of importance here, an abuse of discretion review applies to a discretion-granting plan even if the administrator has a conflict of interest, such as in this case, where Blue Cross is an insurer acting as both the plan administrator and the funding source for benefits. *See Abatie*, 458 F.3d at 965. The fact of that conflict of interest is still to be considered by the Court, however, because when "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict of interest must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Id.* (quoting *Firestone*, 489 U.S. at 115). In considering that factor, the Court's consideration of the abuse of discretion standard is "informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record," including "the kind of inherent conflict that exists when a plan administrator both administers the plan and funds it, as well as to other forms of conflict." *Abatie*, 458 F.3d at 967. For example, as the Ninth Circuit articulated in *Abatie*:

> a straightforward abuse of discretion analysis allows a court to tailor its review to all the circumstances before it. The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, or self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving

participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Id*. at 968-69 (internal citations omitted).

The Supreme Court in *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), decided two years after *Abatie*, made clear that abuse of discretion review, whether or not including conflict of interest as a factor, entails a review of all the circumstances. The Court cautioned against talismans or formulas that would "falsif[y] the actual process of judging." *Id*. at 119. Rather, the Court endorsed a process in which reviewing courts consider all relevant factors, of which, depending on the circumstances, conflict of interest may be one. *Id*. at 117 ("[W]hen judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one.").

It is against this backdrop that the Court considers the propriety of Blue Cross' denials of Lisa O.'s claims.

2.    Applicable Terms of the Plan[7]

To be eligible for benefits under the Plan, "Covered Services must be Medically Necessary and must be provided to an eligible Insured under the terms of th[e] Plan." Plan, p. 31 at BCI 1096 (Docket No. 108, Att. 3). The Plan defines "Medically Necessary" as:

> **Medically Necessary (Or Medical Necessity)** – The Covered Service or supply recommended by the treating Covered Provider to identify or treat an Insured's condition, Disease, Illness or Accidental Injury and which is determined by BCI to be:

---

[7] As is the usual convention, the Plan defines certain terms, identifying defined terms by capitalizing them throughout the Plan. However, some of the defined terms contained within otherwise relevant portions of the Plan are themselves not particularly relevant to the instant dispute. Therefore, for ease of reference, the Court hereby *underlines and italicizes* words within cited portions of the Plan that are not only relevant to the instant action, but also included/defined later in this Report and Recommendation.

**REPORT AND RECOMMENDATION - 15**

1. The most appropriate supply or level of service, considering potential benefit and harm to the Insured.

2. Proven to be effective in improving health outcomes:

   a. For new treatment, effectiveness is determined by peer reviewed scientific evidence;

   b. For existing treatment, effectiveness is determined first by peer reviewed scientific evidence, then by professional standards, then by expert opinion.

3. Not primarily for the convenience of the Insured or Covered Provider.

4. Cost Effective for this condition.

The fact that a Covered Provider may prescribe, order, recommend, or approve a service or supply does not, in and of itself, necessarily establish that such service or supply is Medically Necessary under this Plan.

The term Medically Necessary as defined and used in this Plan is strictly limited to the application and interpretation of this Plan, and any determination of whether a service is Medically Necessary hereunder is made solely for the purpose of determining whether services rendered are Covered Services.

*Id.*, p. 20 at BCI 1085. Included within "Covered Services" are "Psychiatric Care Services,"

described in relevant part as:

1. Covered Psychiatric Care services include Intensive Outpatient Program (IOP), Partial Hospitalization program (PHP), Residential Treatment Program, psychological testing/neuropsychological evaluation testing and Electroconvulsive Therapy (ECT).

   Payments for Inpatient or Outpatient Psychiatric Services apply to Covered Services furnished by any of the following:

   • Licensed General Hospital
   • Alcoholism or Substance Abuse Treatment Facility
   • Psychiatric Hospital
   • Licensed Clinical Social Worker (LCSW)
   • Licensed Clinical Professional Counselor (LCPC)
   • Licensed Marriage and Family Therapist (LMFT)
   • Clinical Psychologist
   • Physician

**2. Inpatient Psychiatric Care**

> The benefits provided for Inpatient hospital services and Inpatient medical services in this section are also provided for the care of *Mental or Nervous Conditions*, Alcoholism, Substance Abuse or Addition, or any combination of these.

*Id.*, pp. 36-37, § XVIII at BCI 1101-02. The Plan defines "Mental or Nervous Condition," as:

> **Mental Or Nervous Condition** – means and includes mental disorders, mental illnesses, psychiatric illnesses, mental conditions, and psychiatric conditions (whether organic or inorganic, whether of biological, nonbiological, chemical or nonchemical origin and irrespective of cause, basis, or inducement). Mental and Nervous Conditions, include but are not limited to: psychoses, neurotic disorders, schizophrenic disorders, affective disorders, personality disorders, and psychological or behavioral abnormalities associated with transient or permanent dysfunction of the brain or related neurohormonal systems.

*Id.*, p. 20 at BCI 1085.

However, the Plan states that "[n]o Benefits will be provided for services, supplies, drugs, or other charges" that are:

> **P.** For Inpatient or Outpatient *Custodial Care*; or for Inpatient or Outpatient services consisting mainly of educational therapy, behavioral modification, self-care or self-help training, except as specified as a Covered Service in this Plan.

*Id.*, pp. 46-47 at BCI –1111-12. "Custodial Care" is defined as:

> **Custodial Care** – care designed principally to assist an individual in engaging in the activities of daily living, or services which constitute personal care, such as help in walking and getting in and out of bed; assistance in bathing, dressing, eating, and using the toilet; preparation of special diets; and supervision of medication, which can usually be self-administered and which does not entail or require the continuing attention of trained medical or other paramedical personnel. Custodial Care is normally, but not necessarily, provided in a nursing home, convalescent home, rest home, or similar institution.

*Id.*, p. 14 at BCI 1079.

Plaintiffs and Healthwise rely upon different portions of these provisions to support their dispositive motions. Plaintiffs argue that the services received by H.H. were for medical

**REPORT AND RECOMMENDATION - 17**

conditions – specifically, mood disorder, not otherwise specified; major depressive disorder; and eating disorder – and that all such services were therefore in the form of "Psychiatric Care Services," which are therefore "Covered Services" under the Plan. Healthwise, on the other hand, contends that the services consisted mainly of educational therapy and/or behavioral modification, which are particularly excluded by the Plan's Exclusion P provision.

     3.     <u>Factual Background Regarding Coverage/Denial Under the Plan</u>

     *a.*     *H.H.'s Enrollment and Treatment at Aspen and New Haven*

From May to July 2010 – approximately six months prior to her treatment at issue in this case – H.H. was treated for eating disorders at Remuda Ranch near Tucson, Arizona, after which she had obtained and "stayed at a normal weight." BCI 182. Following that, she became "more distant and irritable" to her parents. BCI 177. On September 8, 2010, after writing a suicide note, H.H. voluntarily went with Lisa O. to Intermountain Hospital in Boise, Idaho, where H.H. was assessed as being both suicidal and homicidal. BCI 179, 962. However, Lisa O. found Intermountain Hospital to be "essentially a holding tank" and "unhelpful to say the least" and withdrew her. BCI 179-80.

Later in September 2010, Lisa O. decided to enroll H.H. at New Haven in Spanish Fork, Utah. BCI 95, 1019-20. H.H. did not want to go and resisted, and her mother placed her instead in SUWS, a wilderness program in Southern Idaho, that H.H. also resisted. BCI 95. H.H. was discharged from SUWS after about one day due, in part, to "extreme self abuse and violence demonstrated to others [and] need[ing] [a] higher level of care." BCI 243. Still, with the ultimate objective of enrolling H.H. at New Haven, Lisa O. registered her into Aspen (which was located in Syracuse, Utah) in early October 2010, with the plan to transition H.H. to New Haven immediately thereafter. BCI 93, 95, 176, 295.

**REPORT AND RECOMMENDATION - 18**

According to Lisa O., the "specific events" that precipitated her interest in enrolling H.H. at Aspen were that "[H.H.] ha[d] been refusing to participate in her treatment and ha[d] recently started to act out physically." BCI 176. H.H. had experienced "severe emotional problems during the [previous] couple of years" (that Lisa O. considered "to be linked to the hormonal changes of puberty"); had "been noted to have oppositional behaviors for some time"; had "engage[d] in dangerous and impulsive behaviors"; "struggled with 'perfectionism[,]' . . . had 'body image issues[,]' . . . [and] fe[lt] worthless if she does not have a boyfriend." BCI 95. In response to Aspen's enrollment questionnaire, Lisa O.'s "specific objectives" for H.H. while attending programs like those at Aspen and New Haven were to "open her up to participating in longer term therapy" and "help to bring up her self-esteem." BCI 176.[8] Aspen's "Multidisciplinary Report," prepared in the Fall of 2010, "focused on [H.H.'s] symptoms of depression, increasingly defiant attitude, and worsening behavioral problems," noting that H.H. "has been engaging in minor self-mutilation, e.g., scratching skin on her legs and hands . . . to relieve emotional pain." BCI 96.

H.H. was enrolled at Aspen from October 2, 2010 to November 8, 2010, at a cost of approximately $25,425. BCI 93, 557, 1269. While there, H.H.'s progress was tracked. For example, "Weekly Education Progress Notes" documented her classroom attendance, behavior, and work/habits. BCI 227-31, 1049. "Weekly Activity/Recreation Therapy Progress Notes" monitored her group activities (including "cardio/fitness," "leisure education," "experiential ed[ucation]," and "arts/craft"), behavior displayed, hours attended, and participation level. BCI

_____

[8] Plaintiffs now dispute that these objectives, although identified by Lisa O., were the same as the specific objectives of the treatment for H.H. identified by the clinicians who prepared the November 19, 2010 "Master Treatment Plan" and were treating her. *See* Pls.' Resp. to Healthwise's Stmts. of Undisp. Material Facts, pp. 6-7 (Docket No. 112) (citing BCI 18-23).

232-36. "Weekly Nursing Progress Notes" documented her vital signs, diet, appetite, sleep habits, and objectives for upcoming weeks. BCI 219-24.

Ultimately, H.H. only "made limited progress" during her stay at Aspen due to "her marked oppositional defiance and refusal to be engaged in any kind of treatment in meaningful fashion." BCI 114. Records of her stay at Aspen say that H.H. self-reported that "she enjoys being dysfunctional, enjoys being sick, likes being depressed, and has no intention of changing." *Id*. At her discharge from Aspen, H.H. was described as being "nervous, anxious, and frustrated at the prospect of moving on" with "an overall improvement in her mood and functioning," but believed that she did not need further treatment. BCI 115. H.H. "continued to blame her problems on her family and would not commit to treatment." *Id*. Going forward, Aspen recommended that H.H. "attend a residential treatment center to meet her academic, social, and mental health needs," noting that, while H.H. "does not require a lot of behavioral intervention, she does struggle with believing she needs help." *Id*.

After leaving Aspen, H.H. went straight into New Haven on November 8, 2010. New Haven describes itself as a "Residential Treatment Program and Boarding School for Teen Girls" and a "Therapeutic Haven and School for Girls." BCI 1019-20. New Haven's website claims that its academic program includes "college prep," "individual education plans," "the arts," and "student government," and says that New Haven is a member of the National Association of Therapeutic Schools and Programs. *See* Ex. A. to Butler Aff. (Docket No. 108, Att. 8).[9]

---

[9] To this end, Plaintiffs agree that, at New Haven, H.H. began coursework in Spanish, history, math, physical education, science, and art. *See* Healthwise's Stmt. of Undisp. Facts, p. 5 (Docket No. 108, Att. 4) (citing BCI 78-79); Pls.' Resp. to Healthwise's Stmts. of Undisp. Material Facts, p. 10 (Docket No. 112)

H.H.'s stay at New Haven from November 8, 2010 to January 2012 cost approximately $201,875. BCI 1271-76, 1280-81, 1287-90, 1292-93, 1295, 1296, 1299. Her November 19, 2010 "Master Treatment Plan" says she "was referred to New Haven for depression, suicidal ideation, self-harm, defiance, acting out behavior, eating disordered thinking and behavior, and body image issues." BCI 18. Specifically, according to New Haven:

> [H.H.] expresses depression symptoms. She reports feeling down and depressed most of the day, hopeless, decreased interest, feelings of worthlessness, angry/irritable, poor concentration, appetite/weight issues and thoughts of death. Recently before she came to New Haven, she wrote a detailed suicide note. She indicated that she hates herself. Her self-harm has increased since she has been in treatment.

> [H.H.] also struggles with eating disordered thinking and behavior. She has a distorted view of her body, is self-conscious about her body, has perfectionistic and black/white thinking, and engages in binging, purging, and restricting. She says she feels out of control and often feels she is gaining weight.

BCI 19.

Additionally, the Master Treatment Plan outlined a variety of "treatment plan interventions," including: "weekly individuals therapy," "weekly family therapy," "daily group participation," "full participation in the levels program," "active participation in recreational therapy," "therapeutic assignments assigned by [H.H.'s] therapist or treatment team," "family weekends and home passes," at least once-a-month meetings with H.H.'s consulting psychiatrist "to evaluate mood and medications," and regular meetings with H.H.'s dietician. *Id.* The stated objectives of these interventions were that H.H would: "explore the beliefs, thoughts, and attitudes that drive her depressed mood," "look at the triggers for her eating disordered thoughts and behaviors," "learn to understand the factors that make her feel more emotional," "learn to understand her moods better," "learn more effective coping strategies and use them when she is

feeling hurt, sad, or angry," "develop a healthier relationship with food," "learn how to manage her food and practice initiative eating principles," "learn to love herself and see her innate worth [to] see herself in a more positive light," "change her negative self-talk to more positive self-talk," "work through her rigid and inflexible thinking," "practice honest and open communication," "see the value of her life and develop a strong desire to live," and "develop a safety plan when she is feeling suicidal and unsafe." [10]

        *b.      The Pre-Litigation Appeal Process*[11]

•     In a telephone conversation on September 27, 2010 (prior to H.H.'s stay at Aspen and New Haven), a New Haven representative, Heather ("H"), called a Blue Cross representative, Tammy ("T"), to discuss coverage for H.H.'s admission at New Haven. In relevant part, that conversation transpired as follows:

T:      Blue Cross of Idaho, Behavior Health Unit. This is Tammy.

H:      Hi, Tammy. My name is Heather. I'm with InterChange New Haven. We're a residential facility in Utah. And we've recently just admitted one of your member's daughter to our program. And I'm calling to get the process started for coverage.

T:      Okay. Let me just get into where I need to be real quickly . . . . Are you in –

H:      No, we're out of network. Sorry.

T:      Okay. What I'm going to have to do is, is there somebody there than can answer some questions for me?

---

[10] Though many pages within the administrative record are devoted to H.H.'s treatment at New Haven, many are either duplicative of what has already been described or are not integral to the resolution of the issues now before the Court. To be sure, within their Statement of Undisputed Facts in support of their Motion for Summary Judgment, Plaintiffs reference only five treatment notes in 2010 and one treatment note in 2011. *See* Pls.' Stmt. of Undisp. Facts, pp. 8-9 (Docket No. 107).

[11] Because the pre-litigation appeal process is best organized chronologically, for ease of reference, the particular dates and events relating thereto are organized by bulleted paragraphs.

H:      That's why I was calling, is just to find out what you needed.  Kip Rasmussen is her primary therapist, and he would be the person who can do clinical.

T:      No, I need to ask some questions as far as, what the facility is licensed as?

H:      Oh, I can handle all that for you.  We are licensed as a residential treatment.

T:      And do you have – what kind of licensing?  I mean, do you have state licensing, JCAHO [Joint Commission for Accreditation of Healthcare Organizations], what is your accreditation?

H:      We have both.  We are Joint Commission accredited, we are also state licensed for RTC [Residential Treatment Center].

T:      And what level of care do you offer?

H:      I just know it as residential.  And so behavioral health is what we're –

T:      So, Just residential?

H:      Uh-huh.

T:      Okay.  Do you have a doctor that is Board Certified in psychiatry?

H:      Yes, we have two of them.

T:      Okay.  Do you have medical staff there, at the facility, 24 hours a day?

H:      We do.

T:      Okay.  Now, are – you're just resi- – you're licensed as a psychiatric facility?

H:      Uh-huh.

T:      Okay.

H:      Yeah.  Not – oh, yeah.  We're not like a substance abuse, or –

T:      And what is the typical length of stay?

H:      We're a program [that] is nine to twelve months.  However, we do understand, as far as insurance, based off of medical necessity.

**REPORT AND RECOMMENDATION - 23**

T:      And is it a school-based program?

H:      It is.  They are going to school, because of their age; all girls, 13 to 17 years old.

T:      Okay.  Now, uh –

H:      But it's not like a boarding school either.  I mean, they are going to school, and they are learning.  Does that make sense?

T:      Uh-huh.

H:      So the academic portion of the program is only there to meet their age needs, and not necessarily what we are functioning off of.

T:      Okay.  So what I need to do – the patient's contract does have an exclusion for anything that has an educational component to it.  So what I need to do is, I just need to do a little bit more research.  Can I get your phone number, and call you back?

H:      Yeah, that's not a problem.  It's (435) 635-1185.  So now, um, I called on the 13th, and got the facility set up into your system.  And then on the 15th, the were able to quote benefits for residential –

T:      Uh-huh.

H:      – that they do.

T:      Uh-huh.

H:      So I'm confused by the academic exclusion.

T:      I don't think that customer service was aware of that.  I known that there is a note in the system to that effect.

H:      Oh, uh-huh.

T:      From one of the girls in customer service.  But that's a standard exclusion in all of our contracts in Blue Cross, is that we don't pay for any kind of custodial, or educational benefits.

H:      I see what you are saying.  Okay.  I will –

T:      And the mom knows that, because we talked to the mom in depth about it.

**REPORT AND RECOMMENDATION - 24**

H:      Oh, have you?

T:      Yes, I did.

H:      Okay.

T:      And I think customer service did as well.  So she was perfectly aware, that we don't cover custodial care.

H:      Uh-huh.  Okay.  All right.  So –

T:      But what was your first name?

H:      My name is Heather.

T:      So let me just double-check.

H:      So just to throw some things out there, just to try and help this family with any kind of benefits.  If that's not, um – because I get – I get it.  Why would insurance pay for school?  Kind of, you know, between the two of us, that makes a lot of sense.  However, is there an alternative, or something that we can look into, a single case agreement, or something?

T:      Well, the only time we do a single case agreement is if – if the member met our criteria, and if it was something we'd pay for.  I mean, we're not going to pay for anything that is custodial care –

H:      And that –

T:      – or any kind of – umm – I mean, specifically, it looks like your website says, that you're a residential treatment program and boarding school.  And I know that that's what her mother wanted, was for her to be able to go to someplace where she could go to school.

H:      Right.  Well, yeah, I mean, because she is still a teenager, and needs to get that taken care of.

T:      Uh-huh.

H:      So, and – right, like what I had mentioned, is that it's there, and so they are academically meeting those needs.  Umm, and I'm not – I'm not trying to hide that at all.  It's just, you known, we're also functioning off of a treatment plan, medication management, and dietary here, so . . . .

**REPORT AND RECOMMENDATION - 25**

| | |
|---|---|
| Y: | Uh-huh.  So let me go in and staff the case with my manager and the medical director. |
| H: | That's fair. |
| T: | And I won't be able to do anything, as far as a pre-cert, or anything, until I have some clear direction from them. |
| H: | Sure.  Sure. |
| T: | And then I can call you back, Heather. |
| H: | Yeah, that's perfect.  Thank you, Tammy. |
| T: | Bye. |
| H: | Okay.  Bye. |

Ex. A to English Dec. (Docket No. 108, Att. 6).

•      On September 30, 2010, Blue Cross wrote to New Haven, stating it would not authorize the treatment request because of the Plan's Exclusion P: "No Benefits will be provided for services, supplies, drugs, or other charges that are . . . For Inpatient or Outpatient Custodial Care; or for Inpatient or Outpatient services consisting mainly of educational therapy, behavioral modification, self-care or self-help training, except as specified as a Covered Service in this Plan."  BCI 9.

•      On October 12, 2010, Blue Cross again wrote to Aspen, indicating that "no benefits are available for services beginning October 7, 2010 through discharge" because of the Plan's Exclusion P: "Under the Exclusions and Limitations section of the member's policy no benefits can be provided for services, supplies, drugs, or other charges that are: 'For Inpatient or Outpatient Custodial Care, or for Inpatient or Outpatient services consisting mainly of educational therapy, behavioral modification, self-care or self-help training, except as specified as a Covered Service in the Policy.'" BCI 10.

**REPORT AND RECOMMENDATION - 26**

• Also on October 12, 2010, Blue Cross sent a similar letter to Lisa O., denying coverage at Aspen as of October 7, 2010. BCI 930.[12]

• On March 24, 2011, Lisa O. appealed the denial of Plan coverage for H.H.'s treatments at Aspen and New Haven. BCI 5-8. Therein, Lisa O. acknowledged that Blue Cross denied coverage of the care H.H. received at both Aspen and New Haven for the same reason – the Plan's Exclusion P. BCI 5. But Lisa O. took issue with Exclusion P's application to H.H.'s situation, citing the definition of "Mental or Nervous Condition," before stating:

> There is no doubt that Aspen Institute meets the definition of a hospital under this Plan. A copy of their licensure is enclosed for your review. Additionally, the letter states that the entire services were denied beginning October 7, 2010 through discharge. The Aspen Institute claims were processed and Blue Cross of Idaho paid 9 days. While the initial days were considered inpatient acute days and billed as such, all days following the authorized acute days were billed at a residential level of care.
>
> The New Haven Residential Treatment Center claims are also being billed at a residential level of care. There was no difference in the diagnosis from the Inpatient Acute confinement at the Aspen Institute and the claims for the residential treatment center services.
>
> I believe that the diagnosis drives the coverage issue, not the level of care. The Plan covers residential treatment services and it is well known in the industry that a portion of the services rendered while children are contained in a residential treatment center are always educational. Blue Cross of Idaho should not be allowed to cover residential treatment services for adolescents and then deny the care because one of the components of that care (daily per diem charge) includes the child's schooling while they are in such a full-time center.

BCI 6. Lisa O. went on to discuss H.H.'s diagnoses, arguing (and attaching medical records from both Aspen and New Haven) that H.H.'s primary problems were not "behavioral problems

---

[12] Consistent with Blue Cross's October 12, 2010 letters to Aspen and Lisa O., a Blue Cross internal note dated October 7, 2010 states: "Due to the fact that member is attending school and that the treatment seems to be revolving around behavior modification, this hospitalization is a contract exclusion." BCI 1062.

or educational problems," but were instead based on diagnosed mental health conditions which met the Plan's definition of "Mental or Nervous Condition"[13] and should be covered. BCI 7 ("Since her diagnosis fits into the definition of "Mental Illness" in the Plan and since the level of care being rendered is residential (and covered under the Plan), her services should be considered for coverage under my policy."). Moreover, she discussed Exclusion P in its entirety, focusing upon its "except as specified language":

> If you go back and review the definition(s), you can see that the items are excluded *except* if they are specified as a covered service in the policy. Because the services are specified as covered in the policy and fit all plan definitions, the exclusion you used to deny her care, should not apply.

BCI 8 (emphasis in original). Finally, Lisa O. requested that Blue Cross "complete a full, fair, and thorough review of this appeal" and that it "reverse [its] prior decision to deny these benefits under the 'behavioral modification' and educational therapy' exclusion." *Id*.

• On April 7, 2011, Blue Cross denied Lisa O.'s appeal, stating:

> After review of [H.H.'s] medical records, our Medical Director determined she did not meet the medical necessity criteria for treatment in this program. Furthermore, this provider does not meet the criteria as a covered provider for this type of program, because the treatment was primarily for behavioral modification, which is a direct exclusion of the policy. For all these reasons, we must uphold our denial of these services.

BCI 277. Blue Cross then formulaically recited the definitions of "Medically Necessary (Or Medical Necessity)" and "Mental or Nervous Condition" and restated the Plan's language concerning "Psychiatric Care Services" and Exclusion P before stating, without any further elaboration, that:

---

[13] Lisa O. repeatedly states in her March 24, 2011 that H.H.'s diagnosis fits within the Plan's definition of "Mental Illness." *See, e.g.*, BCI 7. However, that term is not defined in the Plan. As such, and because Lisa O. included the definition of "Mental or Nervous Condition" earlier in her letter, it is understood here that she equated "Mental Illness" with "Mental or Nervous Condition."

> We regret we are unable to allow benefits for this type of treatment, as you requested. If you disagree with the results of your first level appeal, you may file a second appeal within 60 days of the date of this letter. Your second level appeal should include any additional information or medical documentation that you feel supports your position. . . . .

BCI 279.

• On April 11, 2011, Blue Cross sent a "corrected" denial letter, to say that the denial was for services provided by *both* Aspen and New Haven. BCI 591-93 ("The only change is the addition of New Haven RTC as a second provider of treatment for [H.H.]."). Blue Cross's April 7, 2011 letter spoke only to Aspen.

• On June 2, 2011, Lisa O. initiated a second level appeal. BCI 585-89. She first argued that Blue Cross's reference to her failure to establish "the medical necessity criteria" for treatment at Aspen and New Have was illogical – that is, such a determination would only be necessary if the Plan otherwise considered coverage available. BCI 585. Regardless, she questioned how Blue Cross even arrived at such a decision concerning medical necessity:

> Going further, you did not provide me with any clinical rationale upon which that determination was based or provide me with any copies of the clinical criteria that you relied on to determine medical necessity in this case. If denial is maintained for medical necessity following this correspondence, and since this is the first time that the medical necessity issue has been raised, I should have an opportunity to present a Level 2 Medical Necessity Appeal following receipt of the appropriate clinical rationale for the denial from your medical director and after you produce to me as required and as I am now requesting, a copy of the clinical criteria. . . . .

> Please note, I will not address the medical necessity issue that was raised in your Level 1 Appeal denial until I receive the Medical Director's clinical rationale and the clinical criteria which was relied upon to render this opinion. Please provide this data immediately. As you probably already know, my plan is governed under federal law, ERISA, and you were required to provide your specific reasons for the medical necessity denial. Also, under URAC (Utilization Review Accreditation Commission) you are required to produce your clinical criteria upon written request.

BCI 585, 589.

**REPORT AND RECOMMENDATION - 29**

Lisa O. then reiterated (and included support from H.H.'s primary therapist at Aspen, Jeff Gregson, via an attached letter) that H.H.'s primary diagnoses – mood disorder and eating disorder – "should not be characterized as a 'behavioral modification' type diagnoses." BCI 586-89. Lisa O. then requested that Blue Cross perform another review of her appeal:

> Because the evidence I am producing is so compelling, I truly believe that additional consideration is warranted. [H.H.'s] services have been inadvertently mischaracterized by Blue Cross of Idaho. Please complete a Level 2 Appeal review of this coverage matter and contact me with your determination. I am once again enclosing all necessary documents including medical records and letters of support.

BCI 589.

• On June 13, 2011, before deciding Lisa O.'s second appeal, Blue Cross wrote to Lisa O., indicating there had been an error in referring to the Medical Necessity definition in its earlier denial, and said that it "will not continue to deny these services on medical necessity grounds," because:

> [a]n administrative error occurred which caused the Medical Necessity definition to be referenced in addition to the contract exclusions relied on, in the communications related to your first level appeal. We have no clinical rationale to provide to you related to these benefits denials because our Medical Director did not review medical necessity criteria in determining to deny these services. The claims were denied due to the group policy exclusion P., as initially communicated to New Haven and Aspen Institute in our preauthorization denial letters dated September 30, 2010, and October 12, 2010, respectively. . . . . We apologize for the confusion caused by the references to medical necessity in our letters of April 7 and April 11, 2011.

BCI 919.

• Shortly thereafter, on June 30, 2011, Blue Cross denied Lisa O.'s second appeal, stating:

> As you noted in your letter of June 2, 2011, a determination of medical necessity is not required if a service is not covered under the policy. Based on the terms of your group policy, I am upholding the denial of the services that [H.H.] received on the dates of service and from the providers listed above, pursuant to Exclusion P., consistent with the preauthorization denials initially issued in this case.

BCI 927.

**REPORT AND RECOMMENDATION - 30**

According to Blue Cross, the services provided by Aspen "were mainly for behavior modification, which is an exclusion of the policy." *Id.* Similarly, according to Blue Cross, the services provided by New Haven "were primarily for custodial care and behavior modification, which, again, is an exclusion of the policy." *Id.* Blue Cross then informed Lisa O. that her internal appeal procedures were exhausted, but that an external review was available if she continued to disagree with Blue Cross's denial of coverage. *Id.*

• On July 11, 2011, Blue Cross sent Lisa O. a letter, stating that, because certain "Explanations of Benefits" had incorrectly referenced "Medical Necessity" as the basis for the denial of coverage (rather than Exclusion P) Blue Cross was providing corrected versions of those Explanations of Benefits to Lisa O. BCI 923-24.

### 4. Blue Cross Abused Its Discretion in Denying Coverage for Plaintiffs' Claims

An ERISA plan administrator/fiduciary abuses its discretion if it (1) "renders a decision without any explanation," (2) "construes provisions of the plan in a way that conflicts with the plain language of the plan," or (3) "fails to develop facts necessary to its determination." *Anderson v. Suburban Teamsters of Northern Illinois Pension Fund Bd. of Trustees*, 588 F.3d 641, 649 (9th Cir. 2009). "[T]he test for abuse of discretion in a factual determination (as opposed to legal error) is whether 'we are left with a definite and firm conviction that a mistake has been committed,' and we may not merely substitute our view for that of the fact finder. To do so, we consider whether application of the correct legal standard was '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009)).

**REPORT AND RECOMMENDATION - 31**

In concluding here that Blue Cross abused its discretion in denying coverage for

Plaintiffs' claims, the undersigned is less concerned about what Plaintiffs have described as Blue

Cross's inconsistent reasons for denial. *See, e.g.*, Pls. Mem. in Supp. of MSJ, p. 5 (Docket No.

106) ("Blue Cross ricocheted from one reason for denial to another throughout the pre-litigation

appeals process."). It is not quite accurate to state (as Plaintiffs do in their briefing) that:

> In their letter dated October 12, 2010, Blue Cross stated that [H.H.'s] treatment was
> not covered because it was custodial care. But then on April 7, 2011, it said the
> treatment was denied because it was not medically necessary.

*Id*. Even though Blue Cross's reasons for denying coverage were not always precise (nor

uniformly consistent), in all of the correspondence and throughout the process Blue Cross relied

upon Exclusion P generally to so justify its denial – from its initial September 30, 2012 letter to

New Haven and October 12, 2010 letters to Aspen and Lisa O., to its final June 30, 2011 letter to

Lisa O. denying her second appeal. *See supra*. It is inescapable that Lisa O. was clearly aware

that the common denominator for Blue Cross's denial of coverage position was the Plan's

Exclusion P. *See* BCI 5 (Lisa O. acknowledging that Blue Cross denied coverage for Aspen and

New Haven services for same reason – Exclusion P).[14]

However, the mere citation of a plan exclusion does not satisfy an insured's duty to its

insured if that exclusion does not apply to preclude coverage. This is undisputably Blue Cross's

burden. *See Merklin v. Liberty Life Assurance Co. of Boston*, 136 Fed. Appx. 29, 32 (9th Cir.

2005). And, in this respect, Plaintiffs' arguments have more traction.

---

[14] At the same time, Exclusion P is made up of many sub-parts whose application might
(or might not, as the case may be) justify the denial of claims under the Plan. The undersigned is
less convinced that Blue Cross consistently applied the elements of Exclusion P to Lisa O.'s
claims. *See infra*.

To begin, Blue Cross's September 30, 2010 letter to New Haven and October 12, 2010 letters to Aspen and Lisa O. are more-or-less identical – each is a one-page denial that simply recites Exclusion P of the Plan as the "Denial Reason," with nothing more. BCI 9-10, 930.

After fielding Lisa O.'s March 24, 2011 appeal (explaining why, in her opinion, Exclusion P does not apply), Blue Cross's April 7, 2011 and April 11, 2011 denial letters shed a speck more light on Exclusion P's significance, stating in a single sentence within the letters' only substantive paragraph: "[T]hese providers do not meet the criteria as covered providers for this type of program, because the treatment was primarily for behavioral modification, which is a direct exclusion of the policy." BCI 277, 591.[15] Conspicuously absent from these letters, however, is *any* supporting rationale for fairly concluding that H.H.'s treatment at Aspen and New Haven was indeed related "primarily to behavioral modification." The "cut and pasted" definitions that followed did nothing to illuminate such a conclusion; to the contrary, including the definition of covered "Psychiatric Care Services" within the body of these letters created more confusion than it resolved when that definition is considered in conjunction with Exclusion P's entire language. BCI 278-79,592-93 *see also infra*.

Then, following Lisa O.'s second appeal (explaining why the medical necessity criteria was unnecessary and, again, why Exclusion P was inapplicable), Blue Cross's June 13, 2011 letter in response says only that "[t]he claims were denied due to the group policy exclusion P., as initially communicated to New Haven and Aspen Institute in our preauthorization letters dated September 30, 2010, and October 12, 2010, respectively." BCI 919. Blue Cross's June 30, 2011

---

[15]  Of course, these letters also discussed how H.H. did not meet the "medical necessity" criteria for treatment in these programs, which Blue Cross later abandoned as justification for denying coverage. *Compare* BCI 277-79, 591-93, *with* BCI 919, 927.

follow-up letter once again generally references Exclusion P, but with some more direct

connection to the disputed charges, saying that (1) Aspen's services were excluded from the Plan

because "the care they provided was mainly for behavior modification," and (2) New Haven's

services were excluded from the Plan because the services provided "were primarily for

custodial care and behavior modification."  BCI 927.  No additional justification or support for

denying coverage was given.  *See id.*

   Even though there were multiple communications between Lisa O. and Blue Cross, the

summary of those communications as set out above highlights the fact that there was no

meaningful exchange of information between Blue Cross and Lisa O. despite the very obvious

(and arguably required) opportunity for the same.  *See, e.g.*, *Abatie*, 458 F.3d at 972 ("When an

administrator can show that it has engaged in an ongoing, good faith exchange of information

between the administrator and the claimant, the court should give the administrator's decision

broad deference notwithstanding a minor irregularity.") (internal quotations and citations

omitted); *Booton v. Lockheed Med. Ben. Plan*, 110 F.3d 1461, 1463 (9th cir. 1997) ("In simple

English, what this regulation [(29 C.F.R. § 2560.503-1(f))] calls for is a meaningful dialogue

between ERISA plan administrators and their beneficiaries.").  Blue Cross did respond in a

timely manner to Lisa O.'s appeals/requests for review and, therein, generically stated the

reasons for its denials.  But the content of Blue Cross's responses to such requests and related

denials of coverage did not even attempt to address Lisa O.'s well-thought-out arguments for

coverage – namely, that H.H.'s diagnosed illness were not behavioral or educational in nature,

but, rather mental health conditions satisfying the Plan's definition of "Mental or Nervous

Condition" within covered Psychiatric Care Services.[16]  In that setting, one cannot say as a matter of law that  Blue Cross engaged in a meaningful dialogue.  Even if its responses could be said to have "set[ ] forth the specific reasons for its denial, written in a manner calculated to be understood by [Lisa O.]," it cannot be said that by simply parroting the prior responses after Lisa O. responded to those denials, that Blue Cross "afford[ed] a reasonable opportunity to [Lisa O.] . . . a full and fair review . . . of the decision denying [her] claim[s]."  29 U.S.C. §§ 1133(1-2); *see also* 29 C.F.R. § 2560.503-1(h)(2)(iv) (providing that "claims procedures [must] [p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination"); *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 870-71 (9th Cir. 2008) (explaining that insurer's denial of benefits letter  was insufficient because it did not explain why information that plaintiff provided was insufficient and did not describe what information plaintiff could have provided to perfect her claim); *James v. AT & T West Disability Benefits Program*, 2014 WL 2465081, *23 (N.D. Cal. 2014) ("While the plan's denial letter and letter upholding the denial cursorily recited excerpts from materials provided by James's treating physicians, they do not meaningfully explain why the treating physicians' conclusions or the facts in the materials are insufficient to find that James is eligible for LTD benefits.").  Viewed in their entirety, Blue Cross's denials of Lisa O.'s claims are arguably closer to being a "rubber stamp" than a reasoned review.

---

[16]  Although "Inpatient or Outpatient Custodial Care" is also excluded by Exclusion P, the record shows no indication that, before June 30, 2011 (the date Blue Cross denied Lisa O.'s second appeal), Blue Cross ever considered that specific justification (at least Custodial Care) a basis for denying coverage for H.H.'s services at either Aspen or New Haven.  Therefore, logically, Lisa O. had no reason to counter such a justification in her appeal paperwork.  *Cf. Abatie*, 458 F.3d at 974 ("[A]n administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA.").

Despite these concerns, the undersigned does not conclude here as a matter of law that Blue Cross's collective denial of Plaintiffs' claims for coverage was an abuse of discretion owing to a failure to elucidate the reasons for characterizing Aspen's and New Haven's services to be either "Custodial Care" or "consisting mainly of . . . behavioral modification" under Exclusion P of the Plan.[17]  Though that may very well be the case (this decision makes no recommendation in this discrete respect), such an argument has some support given the multi-faceted treatment approach taken at both Aspen and New Haven, coupled with the absence of any definition for "behavioral modification" and the standard of review to be applied here.  Instead, what *does* amount to Blue Cross's abuse of discretion as a matter of law is its wholesale disregard of the *entirety* of the nature of the care, and therefore the purported applicability of Exclusion P.

This conclusion draws support from the facts, as referenced above, and from the applicable law.  "Each provision in an [ERISA plan] should be construed consistently with the

---

[17]  Through its briefing, Healthwise attempts to expand out the reasons for denying Lisa O.'s claims by stating that "H.H.'s attendance at Aspen and New Haven was properly considered *"educational therapy"* or "behavioral modification" services.  Healthwise's Mem. in Supp. of MSJ, p. 14 (Docket No. 108, Att. 1) (emphasis added) (relying, in part, upon September 27, 2010 telephone conversation between New Haven and Blue Cross representatives).  That reason (educational therapy), however, was never before identified as a specific basis for denying Lisa O.'s claims.   And, as Healthwise itself acknowledges, "the claim must be decided *solely* on the administrative record below."  *Id*. at p. 13 (emphasis added) (citing *Silver v. Executive Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 731-32 (9th Cir. 2006); *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472 (9th Cir. 1993)).  But more practically speaking, the argument ignores the fact that, at H.H.'s age during treatment at Aspen and New Haven, an educational component of any underlying, primary psychiatric care for a teenager not only would be expected in such a setting, it may have been required by law.  *See* Pls.' Opp. to Healthwise's MSJ, pp. 8-9 (Docket No. 118) ("If Exclusion P applied to every mental heal institution that offered an educational component, all residential treatment facilities and psychiatric hospitals providing treatment longer than one month in the State of Utah would be excluded from coverage.  Thus, the only way Defendants could believe that [H.H.'s] treatment was excluded for being 'educational therapy' is if they ignore the plain language of the plan and Utah's state licensing requirements.").

entire document such that no provision is rendered nugatory." *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997); *see also Brown v. S. Cal. IBEW-NECA Trust Funds*, 588 F.3d 1000, 1003 (9th Cir. 2009) (holding that plan administrator abuses its discretion if its interpretation of the Plan creates a much broader category of prohibited activities than is supported by the plain language of the Plan."). Here, the Plan's Exclusion P contains language excluding from coverage either (1) "Inpatient or Outpatient Custodial Care," or (2) "Inpatient or Outpatient services consisting mainly of educational therapy, behavioral modification, self-care or self-help training." Plan, p. 47 at BCI 1111–12. However, those exclusions are not all encompassing, as the Provision P goes on to say that the exclusions apply "[e]xcept as specified as a Covered Service in this Plan." *Id.* So, read in its entirety, what might otherwise be excluded from the Plan is *not* actually excluded if it is covered elsewhere in the Plan. Such is the case here.

Specifically, the Plan *covers* Psychiatric Care Services, including "[p]ayments for Inpatient or Outpatient Psychiatric Services . . . furnished by [(among others)] Psychiatric Hospital[s]." Also covered, at least as to "Inpatient Psychiatric Care," are expenses "for the care of Mental or Nervous Conditions." *Id.*, pp. 36-37 at BCI 1101-02. H.H.'s treatment at Aspen and New Haven constituted covered Psychiatric Care Services under the Plan.

As Lisa O. argued to Blue Cross, H.H.'s primary diagnoses have always been mood and eating disorders, fitting within the Plan's definition of "Mental or Nervous Condition" and, thus, included within Psychiatric Services and beyond the reach of Exclusion P. BCI 586-89; *see also* Plan, p. 20 at BCI 1085. Blue Cross *never* addressed this component of the Plan, despite its repeated reliance upon Exclusion P, in its back-and-forth with Lisa O. (the very language was

**REPORT AND RECOMMENDATION - 37**

included in the quoted language from Exclusion P contained in the September 30, 2010 and

October 12, 2010 letters sent by Blue Cross to Aspen, New Haven, and Lisa O.). Further, Lisa O.

repeatedly asserted that H.H.'s treatment was not excluded by Exclusion P because of the

"except as specified as a Covered Service" language found in Exclusion P.  BCI 9, 10, 930; BCI

8 (Lisa O. stating: "If you go back and review the definition, you can see that the items are

excluded *except* if they are specified as a covered service in the policy.  Because the services are

specified as covered in the policy and fit all plan definitions, the exclusion you used to deny her

care should not apply.") (emphasis in original).  Blue Cross's current, post-hoc, attempts to

explain away such a position are too little too late.  *See* Healthwise's Mem. in Supp. of MSJ, pp.

17-19 (Docket No. 108, Att. 1).[18]

      Hence, even if one *assumes* that H.H.'s treatment at Aspen and New Haven constituted

either custodial care or mainly behavioral modification (or even educational therapy for that

_____

      [18]  Blue Cross did not address the "Covered Service" exception to Exclusion P leading up
to this action, which undermines its position for the reasons described.  Similarly, Healthwise's
more recently raised arguments also are not persuasive.  Healthwise seems to argue that only
those *otherwise excluded* treatments (e.g., educational therapy, behavioral modification, etc.) that
are also incorporated within a  "Covered Service" are actually covered under the Plan and that,
because neither educational therapy nor behavioral modification is within the definition of
"Mental or Nervous Condition," neither is covered by the Plan.  *See* Healthwise's Mem. in Supp.
of MSJ, p. 18 (Docket No. 108, At.. 1) ("To allow the generalized coverage provisions in *any* of
the Plan's 31 separate Covered Services sections . . . to control over specific exclusions for
particular treatments would allow the specific exclusions to be eviscerated, in contravention of
settled law and all reasonable expectations.").  The disconnect in Heathwise's argument is found
in the fact that the excluded treatment methods identified in Exclusion P are nowhere specified
in the Plan as a component of a recognized Covered Service.  That is to say, reading Exclusion P
the way Healthwise advises this Court to do would make meaningless the "except as specified"
language within Exclusion P.  Just as the term "vested rights" must mean something in the
Release, the "except as" language in the Plan must also mean something.

matter), that treatment was nonetheless Psychiatric Care and is therefore covered under the Plan. As a result, Blue Cross abused its discretion in denying coverage for H.H.'s treatment at Aspen and New Haven because that decision, under the circumstances presented by the record now before this Court, was illogical, implausible, and without support in inferences that could reasonably be drawn. As such, it is recommended that Plaintiffs' Motion for Summary Judgment should be granted[19] and Healthwise's Motion for Summary Judgment should be denied.

### III. RECOMMENDATION/ORDER

Based on the foregoing, IT IS HEREBY RECOMMENDED THAT:

1.      Defendant Blue Cross of Idaho Health Service, Inc.'s Motion for Partial Summary Judgment (Docket No. 99) be DENIED;

2.      Plaintiff's Motion for Summary Judgment (Docket No. 103) be GRANTED; and

3.      Healthwise, Inc.'s Motion for Summary Judgment (Docket No. 108) be DENIED.

Pursuant to District of Idaho Local Civil Rule 72.1(b)(2), a party objecting to a Magistrate Judge's recommended disposition "must serve and file specific, written objections, not to exceed twenty pages . . . within fourteen (14) days . . ., unless the magistrate or district judge sets a different time period." Additionally, the other party "may serve and file a response, not to exceed ten pages, to another party's objections within fourteen (14) days after being served with a copy thereof."

---

[19] This recommendation is tempered with whatever impact the undersigned's simultaneous recommendation on Blue Cross's Motion for Partial Summary Judgment has on such relief requested. *See supra*.

Also based on the foregoing, IT IS HEREBY ORDERED that Plaintiffs' Motion for Award of Attorney Fees Pursuant to the September 2011 Separation Agreement (Docket No. 104) is DENIED, as moot.

DATED: **February 24, 2015**

Honorable Ronald E. Bush
U. S. Magistrate Judge